

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00840-CR

Isaac **CARDENAS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2017CR10269
Honorable Philip A. Kazen, Jr., Judge Presiding

Opinion by:      Sandee Bryan Marion, Chief Justice

Sitting:      Sandee Bryan Marion, Chief Justice
      Rebeca C. Martinez, Justice
      Luz Elena D. Chapa, Justice

Delivered and Filed: October 30, 2019

AFFIRMED

A jury convicted appellant Isaac Cardenas ("Cardenas") of two counts of aggravated sexual assault of a child, and the trial court sentenced him to two life sentences to run concurrently. In two issues on appeal, Cardenas argues the trial court erred in overruling his motion for directed verdict and in overruling his objection to a video and images of the victim in the hospital. We affirm the trial court's judgment.

**Background**

On December 30, 2016, Cardenas invited Crystal Herrera, an acquaintance, to visit him at his grandmother's house on Dixie Lee Road in Bexar County. Crystal brought her twenty-one-month-old daughter N.L. along with her. When she arrived at the house, Crystal put N.L. to sleep in the downstairs living area and then went upstairs with Cardenas. Crystal and Cardenas had sex and then fell asleep.

Shortly before 9 a.m. the next morning, Crystal called 911 to report that N.L. had been bitten by a dog. Paramedics dispatched to the house on Dixie Lee Road encountered several dogs in the front yard, which they described as not aggressive and ranging in size from "as small as [C]hihuahuas up to about a large Labrador." Bexar County Sheriff's Deputy Laura Mata, who arrived at Dixie Lee Road around the same time as paramedics, observed two dogs in the front yard that she described as barking and being "very aggressive." Deputy Mata also encountered Cardenas's grandmother, who was "very angry" because she said "there was not supposed to be anybody there." Deputy Mata observed that N.L. appeared pale and in shock, had a large cut on her anus and wet hair full of sticker burrs, and looked like she had been "dragged through a field."

Crystal told Deputy Mata that when her alarm woke her up at 6 a.m., Cardenas came into the bedroom and told her N.L. had gotten out of the house and had been bitten by a dog. Crystal told Deputy Mata she tried to take N.L. to the hospital, but her car got stuck in the sand, so she returned to the house and gave N.L. a bath before calling 911. Deputy Mata described Cardenas as "very anxious." Cardenas repeatedly asked Deputy Mata if it looked like N.L. was bitten by a dog and said "over and over" that it must have been a dog bite. Deputy Mata testified that when a car pulled up in front of the house and someone inside the car asked Cardenas if everything was okay, she heard Cardenas respond: "I'm in trouble."

Outside the house, Deputy Mata observed N.L.'s diaper and "a lot of [N.L.'s] hair . . . just everywhere." "[T]o me it just—it just looked like that area was staged, like the diaper was taken off perfectly. It wasn't—to me, if it would have been a dog, it would have been destroyed and the diaper was not destroyed." Deputy Mata called her sergeant and told him "something was not right, that it didn't look like a dog bite, and it just didn't feel right." With her sergeant's permission, Deputy Mata called in detectives.

Bexar County Sheriff's Detectives Mark Waits and Miguel Avila were dispatched to Dixie Lee Road. By the time they arrived, Crystal had gone with N.L. to the hospital, and Cardenas and his grandmother were the only people present on the scene except police. Cardenas's grandmother's house was "very, very cluttered," "almost like a hoarding type house." The front yard, like the unimproved road leading to the property, was wet and sandy. There were no dog tracks, human foot prints, or other signs of a struggle in the area of the yard where Cardenas reportedly found N.L. The detectives agreed with Deputy Mata that the diaper in the yard "look[ed] like somebody took [it] off. It did not look like that diaper was shredded or attacked by a dog." The detectives described the dogs on the property as "all restrained or attached to either a rope or a leash," "quiet," "pretty docile," "[t]he opposite of aggressive," "pretty playful, almost scared of us," and "very friendly." Detective Avila testified: "[I]t struck me immediately strange that this dog—a dog would have attacked a kid." Detective Avila also thought it was "strange" that Cardenas told a patrolman on the scene that a dog had "penetrated" N.L.

Detective Avila took Cardenas downtown for an interview while Detective Waits searched the property for sharp objects that might have been used in N.L.'s assault. Cardenas's grandmother, who consented to a search of the property, did not appear to know what was happening. There were "thousands of objects" in the house that could have been used, so detectives collected a few that looked "out of place." Sheriff's officers also collected Cardenas's cell phone at the scene.

Bexar County Sheriff's Deputy Robert Martinez assisted with collecting evidence and taking photographs at the scene. Deputy Martinez photographed the dogs on the property as they were being handled by Animal Control Services and did not observe any blood on the dogs or obvious trauma to the dogs' teeth. Deputy Martinez walked the property looking for other dogs but did not find any. At Detective Waits's request, Deputy Martinez checked N.L.'s clothing collected at the scene for rips and tears or anything else suggesting a dog attack, but he did not observe any. Deputy Martinez also took photographs as officers measured the house's front door to determine whether a child N.L.'s height could reach the door knob and deadbolt lock. Officers measured thirty-eight inches from the ground to the door knob and forty-three inches to the deadbolt lock. N.L.'s medical records reflect her height on December 31, 2016 was 80 centimeters, or approximately 31 inches.

Bexar County Animal Control Officers Christie Banduch and Andrew Winter were dispatched to Dixie Lee Road to respond to a reported dog mauling. The officers did not observe evidence of a dog attack, such as blood or paw prints in the yard's wet sand. Officer Banduch observed "several [tufts] of looked like curly brown hair, laying kind of scattered throughout the yard, which struck me as odd because I wasn't really sure how a dog would have managed to pull out hair in that manner." In the yard, Officer Banduch also observed a child's pair of pants and a diaper, neither of which had tears or blood. Officer Winter testified: "The diaper was removed. It was not torn off by a dog. It was pulled off."

The animal control officers explained that dogs that have been involved in an attack typically will be excitable and aggressive, will have self-inflicted injuries to their lips and tongues, and will be licking their paws to remove blood. Officers Banduch and Winter described the five dogs on the property, however, as "pretty calm," not barking or excited, easy to handle without muzzles, "pretty even keel," "well socialized," "alert, scared, somewhat curious, very submissive,

[and] not at all aggressive." The dogs' paws were not muddy, there was no blood on the dogs, and the dogs had no visible injuries. The largest dog, a forty-pound hound mix, was missing all four incisors and had all four canines ground down to the gums, so "it's really unlikely that she was able to inflict any kind of serious bite on anybody." Officer Winter testified that while the dogs were quarantined, they did not show aggression, nor did they show evidence of rabies. The dogs' nails were clipped, under-nail scrapings were taken and analyzed, and DNA swabs were taken from the dogs' mouths, but subsequent testing did not reveal any evidence that any of the dogs were involved in an attack.

Officer Banduch testified dogs that attack humans typically go for the jugular vein or femoral artery, not the genitals. She explained: "[T]here is never, to the best of my knowledge, been a case where an animal has directly attacked the genitals of a person for any reason. There wouldn't be any reason for them to target that area specifically." Officer Banduch testified predation attacks by domesticated dogs like the dogs found on Dixie Lee Road are "extremely uncommon," and a domesticated dog will not attempt to sexually "penetrate" a human. Officer Banduch also testified she has never encountered a dog attacking or grabbing a child because the child's diaper was dirty, explaining that while dogs may eat their own or other animals' feces, they are not interested in human feces because it is not high enough in protein.

After observing the scene at Dixie Lee Road, Officer Banduch went to the hospital to visit N.L. While N.L.'s upper body was covered in "several slash marks," there were no claw marks or parallel scratch marks from a dog's claws. Officer Banduch observed bite marks on N.L., but those marks "were circular and appeared that if they were bite arches, . . . that would be more consistent with a human bite arch or with a . . . snubbed nose small dog like a pug. It wouldn't have been something that I would have been able to tie to [the dogs on the property] at all." Officer Banduch testified the dogs at Cardenas's grandmother's house could not have caused N.L.'s anal injury

either: "[T]here's no way that a dog could have caused a prolapsed rectum from a bite. The teeth are not going to enter a rectum in a way that it's going to tear like that." She concluded: "I do not believe that any of these injuries were caused by any dog."

Bexar County Sheriff's Sergeant Hayley Robertson also visited N.L. in the hospital as she was being prepared for surgery. Sergeant Robertson made a video recording of N.L., took screenshots from the video, and prepared a DVD containing the video and the screenshot images and sent it to the police investigator on the scene at Dixie Lee Road. Sergeant Robertson testified that while she videoed N.L., N.L. was "just lying there, staring into space." Over Cardenas's objection, the trial court admitted the video and screenshot images as State's Exhibit 28 ("SX28").

A SANE nurse examined N.L. immediately before she underwent her first surgeries. The nurse observed N.L. had matted hair full of grass and debris, grassy debris in her rectal area, extensive injuries everywhere except her feet, and "significant genital injury," including penetration injuries to her vagina and anus. The nurse testified: "I had difficulty telling the difference between vagina and rectum. . . . She had a big gaping hole in her vagina area, as well— as well as the anal area. There was no anal sphincter left. There was no sign of Hymen. . . . I've never observed anything like this before."

Doctor Ronald Stewart, M.D., the chair of the department of surgery at the University of Texas Health Science Center San Antonio, was on call the day N.L. was brought to the hospital. N.L. presented as very listless, a sign of shock caused by low blood flow to the organs. N.L. had two "big gaping really bad-looking wounds," including a large, prolapsed wound where her anus would normally be and a large laceration on her perineum. Dr. Stewart has seen similar wounds caused by high energy impalement, like when "a pole or something impales the area." N.L. had "very complicated perineum wounds . . . there's some linear perineum lacerations next to those big wounds which look like little sort of poke—poke wounds. Also, very atypical from my

standpoint." An MRI scan revealed N.L. also had a ligamentous injury of her cervical spine, which Dr. Stewart explained is evidence that a "high-energy type mechanism" caused the injury.

Nurse practitioner and member of the Center for Miracles child abuse team Kathleen Buckley was called to observe N.L. after her initial surgeries. Nurse Buckley observed that N.L. had lacerations around her perineum that looked like knife wounds, no defensive injuries, and "patterned bruises on her—the inside of her right and left thighs. It's either she had been struck by a belt or had she been, you know, secured by a belt that left those marks." When Nurse Buckley asked N.L. to open a door with a lever knob, N.L. could pull the lever down but could not pull the door open and did not know how to get the door to move. Nurse Buckley explained that a circular door knob, like the one on Cardenas's grandmother's front door, requires more dexterity to operate than a lever knob.

After N.L. was taken to the hospital, Cardenas submitted to a SANE exam. The forensic science supervisor of the serology and DNA section of the San Antonio crime laboratory testified that Cardenas's semen was found on his sweatpants and blue underwear, and there were "sandlike particles" on the leg of the sweatpants. Crystal's DNA was found on the swab of Cardenas's penis, but N.L.'s DNA was excluded from the sample.

Cardenas also agreed to a videotaped interview with Detective Avila, which was played for the jury. During the interview, Cardenas claimed he woke up between 2 a.m. and 4 a.m. and went to check on N.L., at which point he found the front door cracked and N.L. outside. Cardenas took off his shirt to wrap around N.L. but then discarded the shirt in the yard, picked up N.L., and realized she was bleeding as he carried her into the house. While Crystal was cleaning N.L. up, Cardenas claimed he saw "where she got bit or whatever happened" and then went to another room to "give them some privacy." Minutes later, Cardenas heard Crystal start her car. Crystal texted Cardenas to say her car was stuck in the sand, so Cardenas told her to come back inside. Text

messages obtained from Cardenas's cell phone show Crystal texted Cardenas that she was stuck in the sand at 6:47 a.m. Cardenas stated he and Crystal gave N.L. a bath and tried to get the sticker burrs out of her hair. Cardenas then went downstairs, fell asleep, and woke up to a police officer at the door. Under questioning by Detective Avila, Cardenas conceded he might have found N.L. as late as 6 a.m.

Throughout the interview, Cardenas insisted he believed the dogs on the property attacked N.L., stating: "I thought [N.L.] had gone poop and like the dogs, they eat shit, when they see that shit they want her." Cardenas continued: "I think they ripped [N.L.'s clothes] off; there's hair . . . they must've dragged her ass." Cardenas told Detective Avila at least one of the dogs was vicious and had attacked him previously. He also stated: "I heard on the phone the detectives talking and say 'I think that the dog penetrated that little girl.'" Cardenas stated: "I think that black dog tried to have sex with that little girl . . . I think that dog actually penetrated . . . I think it was that one dog 'cause he's a boy." Cardenas also repeatedly expressed that he felt responsible for N.L.'s injuries, stating: "We shoulda called [911] right there and then, I take full respon . . . I wish I woulda just said fuck it I'm gonna call the cops. I honestly wish I could get in trouble right now, I feel like it's my respon . . . I told them to come over, I didn't tell my grandma . . . I didn't think this would happen." Cardenas also stated his grandmother blames him and "says that I did something to the little girl."

At the conclusion of the State's case, the trial court overruled Cardenas's motion for a directed verdict. The jury found Cardenas guilty of two counts of aggravated sexual assault of a child younger than fourteen by intentionally or knowingly causing the penetration of N.L.'s anus and sexual organ, causing serious bodily injury to N.L. Cardenas appeals.

**Motion for Directed Verdict**

In his first issue, Cardenas argues the trial court erred in overruling his motion for directed verdict because the evidence was legally insufficient to support the jury's verdict.

**A.     Standard of review**

We review the trial court's denial of a motion for directed verdict using the same standard we apply to a legal sufficiency challenge. *Hines v. State*, 383 S.W.3d 615, 623 (Tex. App.—San Antonio 2012, pet. ref'd). Under this standard, we review all the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Id.* (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

Circumstantial evidence alone may be sufficient to establish guilt. *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012); *Hooper*, 214 S.W.3d at 13). "In circumstantial evidence cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)). The jury may draw reasonable inferences from the evidence in the record but may not draw conclusions based on speculation. *Id.* at 360. When the record supports conflicting inferences, we presume the jury resolved any conflicts in favor of the verdict and defer to that resolution. *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

**B.     Analysis**

While both parties acknowledge this is a circumstantial evidence case in which the jury based its verdict on inferences drawn from the evidence, Cardenas argues those inferences are unreasonable because they are necessarily based on speculation that neither a mother (Crystal) nor

a "little old lady" (Cardenas's grandmother) could have been N.L.'s assailant, as opposed to Cardenas. Although the evidence supporting the verdict is thin, we must conclude there are enough "incriminating circumstances" that cumulatively support an inference that Cardenas was N.L.'s assailant. *See id.* at 359.

First, the fact that a defendant had the opportunity to commit the crime may be circumstantial evidence of guilt. *See id.* at 360. Here, the evidence demonstrates Cardenas had an opportunity to assault N.L. in the yard while his grandmother and Crystal were asleep in the house. Cardenas told Detective Avila that he and Crystal had sex and fell asleep after N.L. fell asleep between midnight and 1 a.m. Cardenas stated he woke up between 2 a.m. and 4 a.m., or possibly as late as 6 a.m., at which point he claims to have found N.L. injured. Therefore, Cardenas could have assaulted N.L. any time between the time he and Crystal fell asleep and the time he found N.L., which could have been as late as 6 a.m.

In addition, although Cardenas acknowledged his grandmother and Crystal were the only other people present in the house during the time frame in which N.L. was assaulted, he offered testimony tending to exculpate both women. At trial, Cardenas testified he did not believe Crystal caused N.L.'s injuries, stating: "[Crystal] didn't do this. I don't think she did this." Cardenas also testified his grandmother was asleep all night and did not know he had invited Crystal and N.L. to the house. Even after N.L. was assaulted, Cardenas admitted he did not alert his grandmother to the situation because he was "more worried about getting in trouble with [his] grandma than what's happening with [N.L.]." Several other witnesses testified Cardenas's grandmother seemed confused but cooperative, which is consistent with Cardenas's testimony that his grandmother did not know Crystal and N.L. were present at the house.

Second, inconsistent statements and implausible explanations are probative of guilt. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). In this case, the State thoroughly

debunked Cardenas's story that dogs attacked and "penetrated" N.L. A paramedic and detectives who visited the house on Dixie Lee Road described the dogs on the property as not aggressive, "pretty docile," "[t]he opposite of aggressive," "pretty playful, almost scared of us," and "very friendly." Animal control officers explained how N.L.'s injuries were not consistent with mauling by dogs, the area where N.L. was found did not appear to have been the site of a dog attack, and the dogs on the property showed no signs of having been involved in an attack. Contrary to Cardenas's suggestions, animal control officers also testified domesticated dogs will not attempt to sexually "penetrate" a human, nor are they likely to attack a human child because of a dirty diaper. In addition, in response to Cardenas's suggestion that N.L. let herself out of the house, the State introduced evidence that it was unlikely N.L. was tall enough to reach the door knob and probably lacked the dexterity to open the door on her own.

Cardenas also made inconsistent statements to Detective Avila. Cardenas first stated he woke up and discovered N.L. between 2 a.m. and 4 a.m. When Detective Avila asked why neither Cardenas nor Crystal called 911 until 9 a.m., Cardenas stated he might not have discovered N.L. until closer to 6 a.m. Further, Cardenas initially stated N.L. was just "sitting there" and "not crying" when he discovered her, but later stated "[N.L.] was crawling around the grass" and "kind of fussing." Cardenas also made inconsistent statements about what happened after he brought N.L. back into the house, first stating "we" bathed N.L. and then stating Crystal bathed her while Cardenas stepped out of the room to "give them some privacy."

Third, conduct or statements after the commission of a crime indicating a "consciousness of guilt" are compelling circumstantial evidence of guilt. *Hedrick v. State*, 473 S.W.3d 824, 831 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.). In his recorded statement, Cardenas told Detective Avila he felt "respons[ible]" for what happened and believed it was his "fault" for inviting Crystal and N.L. to

his grandmother's house. He stated: "I honestly wish I could get in trouble right now, I feel like it's my respon . . . I told them to come over, I didn't tell my grandma . . . ." Deputy Mata also observed Cardenas tell someone who drove by the crime scene: "I'm in trouble." In addition, Cardenas's failure to call 911 once he observed N.L.'s injuries may be some evidence those injuries were intentionally, not accidentally, inflicted. *See Tezino v. State*, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (holding failure to render aid to an injured child is circumstantial evidence supporting a finding of guilt for intentionally injuring the child).

Finally, testimony regarding the results of Cardenas's SANE exam also supports an inference of guilt. The SANE exam revealed Cardenas had "sandlike particles" on his sweatpants. Because N.L. had "sandy soil" on her body, the SANE exam results support an inference that Cardenas had physical contact with N.L. in the yard before he carried her back into the house. Although the physical evidence equally supports an inference that Cardenas did not get sand on his pants until he carried N.L. into the house, we must presume the jury resolved any conflict in the evidence in favor of its verdict and defer to the jury's determination. *See Temple*, 390 S.W.3d at 360.

Therefore, in light of the cumulative weight of the circumstantial evidence, we conclude the evidence supports a reasonable inference, not based on speculation or gender bias, that Cardenas assaulted N.L. *See id.* at 359 (holding evidence is sufficient if "the combined and cumulative force of all the incriminating circumstances" supports the jury's conclusion). Accordingly, we overrule Cardenas's first issue.

### Admission of Evidence

In his second issue, Cardenas argues the trial court erred in overruling his objection to the video and screenshot images taken of N.L. in the hospital because the probative value of the

evidence is substantially outweighed by the danger of unfair prejudice and needless presentation of cumulative evidence.

## A. Standard of review

Rule 403 permits the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." TEX. R. EVID. 403. We review the trial court's evidentiary rulings for abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). We will not reverse the trial court's decision on admissibility of evidence unless it falls outside the zone of reasonable disagreement. *Id.*

A photograph is generally admissible if verbal testimony regarding the matter depicted in the photograph is also admissible. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Photographs showing a victim's injuries inflicted by the defendant are relevant and admissible to show the defendant's guilt, even if they merely corroborate other kinds of evidence. *See id.* In deciding whether a photograph's probative value is substantially outweighed by the danger of unfair prejudice, we consider the following factors: the number of photographs, their size, whether they are in color or black and white, whether they are gruesome, whether any bodies are clothed or naked, and whether a body has been altered, such as by autopsy. *Id.*; *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). The same rules are applicable to video evidence. *See Fields v. State*, 515 S.W.3d 47, 56 (Tex. App.—San Antonio 2016, no pet.) (citing TEX. R. EVID. 1001(a)).

## B. Analysis

Cardenas specifically objects to SX28—a four-minute cell phone video and thirty screenshot images extracted from the video. Sergeant Robertson testified she took the video while N.L. was being prepared for surgery. The video and screenshot images are clear and in color. The

video, which does not include audio, depicts N.L.'s full body in wide view and zooms in periodically to show particular injuries at close range, including the injuries to N.L.'s genital and anal areas. The screenshot images are close-up depictions of N.L.'s injuries.

Cardenas argues the video and screenshot images are "gruesome," "exceedingly difficult to look at," and were introduced for "shock value" rather than probative value. While the images are extremely difficult to look at, they were not enhanced in any way and depict N.L.'s injuries shortly after she sustained them and before she had her first surgeries. Courts have upheld admission of far more gruesome images than these where, as here, the images depict the victim's injuries. *E.g., Gallo*, 239 S.W.3d at 763–64 (upholding admission of gruesome photographs of dead three-year-old victim, including photographs of vaginal injuries, because they were "highly probative to show the full extent of the injuries appellant inflicted on the victim"); *Wyatt v. State*, 23 S.W.3d 18, 29–30 (Tex. Crim. App. 2000) (upholding admission of autopsy photographs of child victim's injured anus because they were "not particularly offensive," "not enhanced in any way," and "portrayed no more than the gruesomeness of the injuries inflicted").

Cardenas also argues the video and images are cumulative of other images of N.L.'s injuries contained in her medical records, which were introduced in evidence. Unlike SX28, however, the photographs in the medical records do not depict N.L. as she looked when she arrived at the hospital, nor do they show the full extent of her nearly head-to-toe injuries. SX28 is also highly probative not only to show the nature and extent of N.L.'s many injuries, but also to rebut Cardenas's argument that N.L.'s injuries were caused by dogs. SX28 illustrates Animal Control Officer Banduch's testimony that the many "slash marks" covering N.L.'s body are not the type of parallel scratches that would be caused by the claws of a dog's paw, as well as Dr. Stewart's testimony that "all these little scratches" covering N.L.'s body were not consistent with dog bites.

Because SX28 depicts N.L.'s injuries as they appeared before surgery, is not cumulative of other evidence, and is highly probative of the nature and cause of N.L.'s injuries, we conclude SX28's probative value is not substantially outweighed by the danger of unfair prejudice or needlessly presenting cumulative evidence. Therefore, the trial court did not abuse its discretion in admitting it over Cardenas's objection. We overrule Cardenas's second issue.

## Conclusion

Having overruled Cardenas's two issues, we affirm the trial court's judgment.

Sandee Bryan Marion, Chief Justice

DO NOT PUBLISH